## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| TOMAS MEDINA,<br><br>                              *Plaintiff,*<br><br>                    v.<br><br>THE CITY OF NEW YORK, POLICE COMMISSIONER JAMES O'NEILL, CHIEF OF DEPARTMENT TERRANCE MONAHAN, SERGEANT HEKMATULLAH MUKHTARZADA, DETECTIVE SPECIALIST FABIO NUNEZ, POLICE OFFICER SHANEE (PIERCE) HANSLER, POLICE OFFICER DAVID CALLAN, CAPTAIN WILLIAM J. GALLAGHER, SERGEANT JOSE A. GOMEZ, POLICE OFFICER NAY HTOO, POLICE OFFICER CHRISTOPHER SICILIANO, and POLICE OFFICER JOHN DOE,<br><br>                              *Defendants.* | Civil Case No.: 19 Civ. 9412<br><br>*Document Electronically Filed*<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Tomas Medina, by the undersigned attorneys, brings this action against the City of New York (the "City"), New York Police Department ("NYPD") Police Commissioner James O'Neill, Chief of Department Terrance Monahan, Sergeant Hekmatullah Mukhtarzada, Captain William J. Gallagher, Detective Specialist Fabio Nunez, Police Officer Shanee (Pierce) Hansler, Police Officer David Callan, Sergeant Jose A. Gomez, Police Officer Nay Htoo, Police Officer Christopher Siciliano, and presently unidentified Police Officer John Doe, alleging as follows:

## PRELIMINARY STATEMENT

1.      Over 25 years ago, in the wake of public outcry over multiple civilian deaths resulting from chokeholds by police officers across the country, the NYPD instituted a formal policy banning chokeholds. This policy purports to limit chokeholds to situations where deadly force is necessary and no other less lethal force can be used. Nevertheless, NYPD police officers, in an egregious violation of this policy, still regularly misuse this dangerous maneuver to neutralize civilians. Indeed, between January 2015 and June 2018, the City settled at least 30 lawsuits involving the use of chokeholds by the NYPD. During that same time period, the New York City Civilian Complaint Review Board ("CCRB") received at least 582 allegations of NYPD officers using chokeholds against civilians.

2.      Equally disturbing, NYPD officers wrongly deploy Tasers in situations where civilians have shown no active aggression. The NYPD also overuses Tasers once they are deployed, with multiple or prolonged shocks resulting in needless pain and injury to civilians. Between January 2015 and June 2018, the City settled at least 14 lawsuits involving the use of Tasers by NYPD officers.

3.      The NYPD's grossly inadequate use-of-force training and supervision fail to impress upon officers the limited circumstances and manner in which chokeholds and Tasers may be used on civilians. When incidents of chokehold or Taser misuse arise, the NYPD conducts cursory investigations, which almost invariably result in a failure to discipline offending officers. This practice effectively green lights officers' continuing abuse of civilians with chokeholds and Tasers.

4.      The inevitable result of these institutional failures is NYPD police officers' widespread use of these dangerous techniques without justification. The facts, detailed below,

exemplify but one example of hundreds of unconstitutional chokehold and Taser misuse incidents alleged against the NYPD in the last few years.

5.      Defendant Fabio Nunez is a NYPD police officer who has been the subject of 37 allegations of misconduct reported to the CCRB, arising out of 17 separate complaints. He has also been the subject of five separate settlement agreements, which include multiple incidents of alleged excessive force. Instead of punishing Defendant Nunez for this pattern of abusive conduct, the NYPD promoted him to a Neighborhood Coordination Officer.

6.      On July 14, 2018, Defendant Nunez struck again. He was caught on police body cameras and surveillance footage as he deliberately attacked the Plaintiff, Tomas Medina, while Mr. Medina's back was turned. Nunez applied a banned chokehold and shocked Mr. Medina thirteen times with a Taser without the least provocation. Video footage of this assault is attached to this complaint as Exhibits A and B.

7.      Defendant Nunez's purported justification for his actions was that Mr. Medina and his friends were playing loud music. However, the officer was aware that Mr. Medina was not controlling the music and that he did not own the speaker playing the music.

8.      Moreover, as soon as Defendant Nunez arrived at the scene, Mr. Medina and his friends turned the music off immediately and began to pack up. According to the NYPD's own rules governing noise violations, that should have ended the encounter, but it did not.

9.      The NYPD's internal messaging to officers in response to media coverage of Defendant Nunez's assault on Mr. Medina was delivered by the highest-ranking uniformed member of the NYPD, Defendant Terrance Monahan. Monahan defended Nunez by stating that

he "used the necessary force to take [Mr. Medina] into custody."[1] This response illustrates the NYPD's explicit approval of its officers' unconstitutional chokehold and Taser use against civilians.

10.    To stop the NYPD from tolerating and encouraging these continued violent and illegal acts, Mr. Medina seeks declaratory and injunctive relief, as well as damages for his own pain and injuries arising from the July 14, 2018 incident.

## JURISDICTION AND VENUE

11.    This action is brought pursuant to 42 U.S.C. § 1983 and Amendments Four and Fourteen to the Constitution of the United States. Jurisdiction is conferred upon this Court under 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4), as this is a civil action arising under the Constitution and laws of the United States in addition to pendent jurisdiction over related state causes of action. This court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

12.    Venue is proper pursuant to 28 U.S.C. § 1391(a), (b), and (c) because all of the events giving rise to Plaintiff's claims occurred in the Southern District of New York.

13.    On October 4, 2018, Plaintiff filed a Notice of Claim. On January 24, 2019, he attended a hearing pursuant to N.Y. Gen. Mun. Law §50-h. Accordingly, the procedures specified by N.Y. Gen. Mun. Law §§ 50-e and 50-i are exhausted.

## PARTIES

14.    Plaintiff Tomas Medina is a 35-year-old Latino man who, at all times relevant herein, has been residing in New York City, either in Bronx or Queens County, New York.

---

[1] Jillian Jorgensen, Thomas Tracy, & Graham Rayman, *NYPD Chief defends detective who used chokehold on man after responding to a noise complaint*, N.Y. DAILY NEWS (Aug. 21, 2018), https://www.nydailynews.com/new-york/ny-metro-chief-supports-cops-viral-videos-20180820-story.html.

15.     Defendant City is a municipal entity created and organized under the laws of the State of New York. The City is authorized by law to maintain a police department, which acts as its agent for purposes of law enforcement and for which the City is responsible. The City is responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and is responsible for the appointment, training, supervision, discipline and retention, and conduct of all NYPD personnel as policy-maker and employer under *respondeat superior*. The City is responsible for enforcing the rules of the NYPD, and for ensuring that NYPD personnel obey the laws of the United States and the State of New York.

16.     Defendant James O'Neill was Police Commissioner of the NYPD for all relevant time periods and is sued in his individual and official capacities.

17.     Defendant Terrance Monahan was Chief of Department of the NYPD for all relevant time periods. Monahan was personally involved in failures to investigate this matter, and helped craft the policies that led to the violations of Mr. Medina's rights. Monahan is sued in his individual and official capacities.

18.     Defendant Hekmatullah Mukhtarzada was the supervising Sergeant from the 34th precinct at the time of the incident and is sued in his individual and official capacities.

19.     Defendant Fabio Nunez was a Detective Specialist at the time of the incident working in the 34th precinct as a Neighborhood Coordination Officer as a part of the NYPD's community policing program. Nunez is sued in his individual and official capacities.

20.     Defendant Shanee (Pierce) Hansler was a Police Officer at the time of the incident working in the 34th precinct as a Neighborhood Coordination Officer as a part of the NYPD's community policing program. Pierce is sued in her individual and official capacities.

21.     Defendant David Callan was a Police Officer at the time of the incident working in the 34th precinct. Callan filed criminal complaints with false statements on behalf of Defendants Nunez and Hansler that caused Mr. Medina to be prosecuted. Callan is sued in his individual and official capacities.

22.     Defendant William J. Gallagher was a Patrol Duty Captain at the time of the incident working in the 34th precinct and recommended that no further action be taken in response to the incident. Gallagher is sued in his individual and official capacities.

23.     Defendant Jose A. Gomez was a Detective at the time of the incident working in the 34th precinct and participated in the initial force investigation. Gomez is sued in his individual and official capacities.

24.     Defendant Christopher Siciliano was a Police Officer at the time of the incident who searched Mr. Medina at least twice, once on the scene and a second time at the precinct. Both of Siciliano's searches included needlessly exposing Mr. Medina in his underwear. After the search at the precinct, Siciliano further humiliated Mr. Medina by leaving his pants hanging down. Siciliano is sued in his individual and official capacities.

25.     Defendant Nay Htoo was a Police Officer at the time of the incident who searched Mr. Medina at the precinct. Htoo's search included needlessly exposing Mr. Medina in his underwear. At the precinct, Htoo further humiliated Mr. Medina by leaving his pants hanging down. Htoo is sued in his individual and official capacities.

26.     Defendant John Doe, a Police Officer, slapped Mr. Medina in the back of the head, causing his head to slam against the hood of a car while he was handcuffed. John Doe is sued in his individual and official capacities.

## STATEMENT OF FACTS

27.     The conduct giving rise to the violation of Mr. Medina's rights occurred because

of the policies, practices and/or customs of the City, and because of the Supervisory

Defendants'[2] failures to enforce in practice the definition of and restrictions on chokeholds and

Tasers in the NYPD Patrol Guide, and the failures to train, supervise, investigate, or discipline

officers for excessive use of force or for making false statements to cover up violent encounters.

28.     All statements below are made based on personal knowledge of Plaintiff, his

attorneys, court files, witnesses, body camera footage, surveillance footage, materials referenced,

and upon information and belief.

**A.  The City Is on Notice of Widespread Chokehold Use and Abusive Taser Use by NYPD Officers as a Result of its Policies, Practices, and Customs**

    *i.  Chokeholds*

29.     In 1993, former NYPD Police Commissioner Ray Kelly clarified a 1985 order

limiting chokehold use. Kelly's clarification resulted in a complete ban on chokehold use. The

Commissioner's actions were prompted by "concerns about the rising number of deaths in police

custody" relating to chokehold misuse. Chief John F. Timoney, former Commander of the

NYPD's Office of Management Analysis and Planning, described the 1993 policy clarification

by stating "Basically, stay the hell away from the neck . . . That's what it says."[3]

30.     Since Commissioner Kelly's actions, the NYPD Patrol Guide has generally

prohibited the use of chokeholds for more than 25 years, as have most police departments across

the country, the only exception being for situations where deadly force is necessary and no other

---

[2] Defendants O'Neill, Monahan, Mukhtarzada, Gallagher, and Gomez each acted in a supervisory capacity at various points alleged with further detail herein.
[3] Ian Fisher, Kelly Bans Choke Hold By Officers, N.Y. Times, Nov. 24, 1993, at B1, https://www.nytimes.com/1993/11/24/nyregion/kelly-bans-choke-holds-by-officers.html.

less lethal type of force is available. The NYPD's use of force policy defines a chokehold as "any pressure to the throat or windpipe, which may prevent or hinder breathing or reduce intake of air."[4] Despite the NYPD's general prohibition of the use of chokeholds, NYPD officers still regularly utilize the dangerous technique on civilians.

31.     NYPD officers, across all five boroughs and from a range of ranks and commands, have been accused of using chokeholds in at least 40 federal civil rights lawsuits filed between January 2015 and June 2018. The City settled at least 30 of these lawsuits involving the use of chokeholds by NYPD officers for at least $1,236,502. These numbers are based on public records available to Plaintiff, detailed in Exhibit C.

32.     Upon information and belief, these examples represent only a small fraction of the actual number of recent instances of NYPD officers using chokeholds against New Yorkers. These cases capture only those incidents that were the subject of lawsuits or of news coverage that Plaintiff has become aware of. The reported amount settled by the City in chokehold-related cases—more than $1.2 million dollars for cases litigated between 2015 and June 2018—during this time is likely "woefully incomplete" according to an investigative report by the New York Post. The Post found that the reported settlements of cases against the NYPD and its officers fails to account for settlements made by the City Comptroller's office.[5]

33.     Additionally, the CCRB receives, investigates, mediates, hears, makes findings, and recommends action on complaints against NYPD police officers alleging, among other

---

[4] CCRB, *A Mutated Rule: Lack of Enforcement in the Face of Persistent Chokehold Complaints in New York City* ix (Oct. 7, 2014), https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/20141007_chokehold-study.pdf.
[5] *See* Craig McCarthy, *NYPD's tally of lawsuit settlements fails to account for $22 million*, N.Y. POST (Sept.15, 2019, 10:48 P.M.), https://nypost.com/2019/09/15/nypds-tally-of-lawsuit-settlements-fails-to-account-for-22-million/.

offenses, the use of excessive or unnecessary force. According to the CCRB's Data

Transparency Initiative, the agency received 1,811 chokehold allegations from January 2009 to

December 2018. From these public reports, the NYPD is on notice that an average of 181

chokeholds have been reported per year—an average of 15 chokehold allegations per month, or

one chokehold allegation every two days—over the past ten years.[6]

34.     According to the CCRB's website, it only issues "Issue-Based Reports" when

"[the] CCRB's investigation of complaints and data analysis sometimes reveals problems that go

beyond specific acts of misconduct and suggest the need for a change in police department

policy, procedures, or training. When this occurs, the board notifies the police commissioner and

recommends solutions."[7]

35.     The CCRB found a sufficient pattern and practice from 2009 to June 2014 to

merit closer study in a full "Issue-Based Report" entitled "A Mutated Rule: Lack of Enforcement

in the Face of Persistent Chokehold Complaints in New York City."[8]

36.     The 2014 CCRB report found that "during the last decade, the NYPD disciplinary

decisions in NYPD administrative trials of chokehold allegations failed to enforce the clear

mandate of the Patrol Guide chokehold rule" and that "the chokehold rule 'mutated' to adapt to

the NYPD disciplinary process, rather than the disciplinary process following the NYPD rule."[9]

The CCRB concluded:

> This pragmatic redefinition of the rule in response to the NYPD's systematic refusal to
> impose discipline in all but the most severe chokehold cases, evolved into an unwritten,
> much less protective definition: actual and sustained interference with breathing was

---

[6] CCRB Data Transparency Initiative, *What types of force allegations have the CCRB received over time?*,
Chokeholds from 2009 to 2018, https://www1.nyc.gov/site/ccrb/policy/data-transparency-initiative-allegations.page.
[7] CCRB, *Issue-Based Reports*, https://www1.nyc.gov/site/ccrb/policy/issue-based-reports.page (last visited Oct. 9,
2019).
[8] CCRB, *A Mutated Rule*, *supra* note 4, at viii.
[9] *Id.*

9

substituted for the Patrol Guide's clear and unequivocal prohibition of any pressure to the neck which 'may' inhibit breathing. In essence, inadequate disciplinary practices transplanted the heart of the chokehold rule during a period in which, as the number of chokehold complaints suggests, chokehold incidents were increasing.[10]

The CCRB report ultimately recommended that "NYPD's blanket prohibition of chokeholds should be restored and uniformly enforced."[11]

37.     Recognizing that the use of chokeholds has persisted despite the NYPD's policy, members of the New York City Council have advocated for legislation to make the use of chokeholds a misdemeanor.[12] Leaders of the NYPD, including Commissioner William Bratton and former Deputy Commissioner Larry Byrne, have lobbied local lawmakers not to criminalize the use of chokeholds and to continue allowing the NYPD to address violations of the chokehold policy internally, without additional oversight from local district attorneys and judges.[13] Essentially, the NYPD seeks to insulate its officers who have used chokeholds from external scrutiny so that they can avoid disciplining officers in all but the most extreme cases.

38.     Despite the 2014 Issue-Based Report, complaints of chokehold use have persisted. From 2015 through 2018, the CCRB received at least 582 chokehold allegations.[14] According to a May 2019 report by the *New York Times*, "[r]ecords of complaints show the banned [choke]holds are still being used by some officers, and only a tiny fraction of officers accused of

---

[10] *Id.*

[11] *Id.*

[12] *See* Jeff Mays, *Councilman Introduces Law to Make NYPD Chokeholds Illegal*, DNAINFO (Nov. 17, 2014, 8:48 AM), https://www.dnainfo.com/new-york/20141117/civic-center/councilman-introduces-law-make-nypd-chokeholds-illegal/; *See also* New York City Council, Int. 0540-2014, A Local Law to amend the administrative code of the City of New York, in relation to chokeholds, (Nov. 13, 2014), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=2015556&GUID=1CB2BD89-B975-4B62-B225-1ACDA495C354&Options=ID|Text|&Search=chokehold.

[13] *New York City Council Committee on Public Safety*, 22, 55-56 (June 29, 2015) (testimony of William Bratton, NYPD Commissioner & Larry Byrne, NYPD Deputy Commissioner), https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=2015556&GUID=1CB2BD89-B975-4B62-B225-1ACDA495C354&Options=ID|Text|&Search=chokehold.

[14] *See* CCRB, *Annual Report 2018, Figure 12: FADO Allegations Received by Type, 2017-2018*; CCRB, *Annual Report 2016, Figure 15: FADO Allegations by Type 2015-2016*.

chokeholds have been found guilty and have faced discipline. When they do, the punishment meted out has been remedial training and the loss of vacation time. None have been fired."[15] Since the above-cited New York Times report was published, Police Officer Daniel Pantaleo has been fired for his role in the choking death of Eric Garner in 2014. The NYPD, however, failed to prosecute Pantaleo for a chokehold and he was only prosecuted because of the CCRB's Administrative Prosecution Unit. Upon information and belief, none of the other allegations and substantiations of chokeholds that Plaintiff can access have resulted in terminations or suspensions of the officers involved.

ii.   *Tasers*

39.     NYPD officers across New York City's boroughs and Precincts have been accused of inappropriately using Tasers in at least 24 federal civil rights lawsuits pending litigation between January 2015 and June 2018. The City settled at least 14 of these lawsuits involving the use of Tasers by NYPD officers for at least $828,000. These numbers are based on public records available to Plaintiff, detailed in Exhibit D.

40.     Upon information and belief, these examples represent only a small fraction of the actual number of recent instances of NYPD officers using Tasers against New Yorkers. These cases capture only those incidents that were the subject of lawsuits or of news coverage that Plaintiff has become aware of. As raised in paragraph 32, the reported amount settled by the City of New York in Taser-related cases during this time—$828,000—is likely incomplete because of the lack of reporting of cases settled through the Notice of Claim process with the City's Comptroller.

---

[15] Ali Winston, *Despite Eric Garner and 'I Can't Breathe,' Chokeholds Still Used*, N.Y. TIMES (May 9, 2019), https://www.nytimes.com/2019/05/09/nyregion/eric-garner-death-chokeholds.html.

41.     Additionally, according to the CCRB's Data Transparency Initiative, the agency received 449 allegations of force involving the use of nonlethal restraining devices from January 2014 through December 2018. From these public reports, the NYPD is on notice that an average of 90 allegations regarding Taser misuse have been reported per year over the past five years.[16]

42.     The CCRB found a sufficient pattern and practice of Taser misuse from January 2014 through December 2015 to merit closer study in a full "Issue-Based Report." The CCRB reported that Tasers may be vulnerable to overuse by officers. The report noted that, while typically nonlethal, Tasers cause "physical anguish" and "excruciating pain that radiates through the body" that the CCRB urged the NYPD not to overlook when considering the risk of Taser overuse and misuse by law enforcement. [17]

43.     In 2011, the New York Civil Liberties Union (NYCLU) issued a report analyzing 851 Taser incident reports from across New York state, including many incidents involving the NYPD. NYCLU found that nearly 60% of reported Taser incidents in New York did not involve active aggression by the subject or risk of physical injury caused by the subject's conduct, that "more than one-third of Taser incidents involved multiple or prolonged shocks," and that "[f]ifteen percent of Taser incident reports indicated clearly inappropriate Taser use, such as officers shocking people who were already handcuffed or restrained."[18]

---

[16] CCRB, *Data Transparency Initiative*, *supra* note 6.
[17] Civilian Complaint Review Board, Tasers: An Evaluation of Taser-Related Complaints from January 2014 through December 2015, (Oct. 23, 2016),
 https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/20161023_taser-report.pdf.
[18] Corey Stoughton, Taylor Pendergrass, Helen Zelon, & Alia Al-Khatib, *Taking Tasers Seriously: The Need for Better Regulation of Stun Guns in New York*, NYCLU (2011), https://www.nyclu.org/en/publications/report-taking-tasers-seriously-need-better-regulation-stun-guns-new-york-2011.

44.     Both the 2011 NYCLU report and the 2016 CCRB report on Taser use document the fact that Black and Latino New Yorkers are disproportionately tased by law enforcement.[19]

45.     Complaints of Taser misuse have persisted well beyond the release of the CCRB's special report on Tasers in 2016. In 2017 and 2018, the CCRB received at least 182 allegations that officers used Tasers in excessive and impermissible ways.[20]

**B.  Despite Widespread Chokehold and Taser Misuse, the City's Policies and Practices Continue to Fail to Train or Supervise Officers on Proper Uses of Chokeholds and Tasers**

   *i.   Chokeholds*

46.     The NYPD has on paper issued a general prohibition of the use of chokeholds. In his 2015 testimony before the New York City Council's Committee on Public Safety, Commissioner William Bratton testified that "we continue to prohibit the use of a chokehold as a policy matter."[21] However, inadequate training and supervision effectively undercut the rule against chokeholds.

47.     Upon information and belief, the City and the NYPD have failed to train and supervise officers, or have inadequately trained and supervised officers, in understanding (i) how dangerous any contact with the neck can be (ii) how to discern situations where deadly force is necessary and no other less lethal options are available.

48.     If training did indeed happen, it failed to communicate to officers how dangerous contact with the neck can be, how to discern circumstances that require deadly force, and how to

---

[19] *Id.*; CCRB, *Tasers, supra* note 17.
[20] CCRB, *Annual Report 2018, Figure 12: FADO Allegations Received by Type, 2017-2018*, 16 (2018), https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2018CCRB_AnnualReport.pdf.
[20] CCRB, *Annual Report 2018, Figure 12: FADO Allegations Received by Type, 2017-2018*, 16 (2018), https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2018CCRB_AnnualReport.pdf.
[21] *New York City Council Committee on Public Safety, supra* note 13, at 21 (testimony of William Bratton, NYPD Commissioner).

avoid it by using less lethal measures. Upon information and belief, the NYPD's force training

fails to prevent officers from using chokeholds, such as the one Defendant Nunez used on Mr.

Medina. The Plaintiff also awaits information pursuant to FOIL requests that will further support

his claim. A copy of the FOIL request submitted by Plaintiff and the response received to date

from the NYPD is attached to this complaint as Exhibits E and F, respectively.

49.     Upon information and belief, the NYPD's training on the use of force, falls below

national training standards set by the International Association of Chiefs of Police ("IACP"). The

IACP National Consensus Policy sets recommended standards for officer training on the use of

force, including that all officers shall receive, at a minimum, annual training on the use of force

policy and related legal updates. The IACP further states that this training shall include

"techniques for the use of and reinforce the importance of de-escalation" and "enhance officers'

discretion and judgement in using less-lethal and deadly force."[22]

50.     This insufficient training is readily apparent in the present case. In his CCRB

hearing, Defendant Nunez demonstrated ignorance about the conduct that constitutes a

prohibited chokehold, explaining that his maneuver on Mr. Medina was not a chokehold because

"[i]f you use a chokehold on someone, he won't be able to speak at all." When a CCRB

investigator asked Defendant Nunez to define a chokehold, Nunez responded "[c]hokehold, you

need two arms to do a chokehold. You don't do a chokehold with one arm. . . . hooking one arm,

then the other arm for leverage, for pressure." [23] Defendant Nunez's CCRB Interview Audio is

attached to this complaint as Exhibit G. This is in stark contrast to the NYPD Patrol Guide 221-

01's definition of a chokehold, which states that "[a] chokehold shall include, but is not limited

---

[22] IACP, *National Consensus Policy and Discussion Paper on the Use of Force*, 4 (Oct. 2017),
https://www.theiacp.org/sites/default/files/all/n-o/National_Consensus_Policy_On_Use_Of_Force.pdf.
[23] Ex. G, Nunez, CCRB Interview at 47:20.

to, any pressure to the throat or windpipe, which may prevent or hinder breathing or reduce intake of air."

51.     While the NYPD did introduce "Threat, Injury or Resistance" forms in 2016[24] to improve supervision over officers' uses of force, these reports and accompanying investigations by supervisors have failed to identify, investigate, and correct misconduct by the NYPD. This is evidenced by the 34th precinct's, Defendant Monahan's, Defendant Andrea's, Defendant Gallagher's, and Defendant Gomez's failure to recognize any misconduct in Defendant Nunez's actions towards Mr. Medina.[25]

   *ii.   Tasers*

52.     The City and the NYPD have failed to train officers on their use of Tasers, despite the manufacturer's warnings and NYPD guidelines on Taser use. NYPD officers across a range of precincts and commands in New York City frequently misuse Tasers, including: (1) in situations that do not warrant the use of force, where de-escalation techniques should be used, or where alternative and less risky methods of restraint would suffice; (2) for more than three discharges and/or durations of greater than fifteen seconds; and (3) as a method of punishment and coercion rather than as a method of subduing someone.

53.     Plaintiff has submitted a FOIL request for a copy of the NYPD's trainings related to use of force but has not received a response. *See* Exs. E and F.

54.     Upon information and belief, the NYPD's training on the use of Tasers falls below national training standards set by the IACP. IACP guidance on the use of Electronic

---

[24] NYPD, *Interim Order No. 36: Reporting and Investigation of Force Incident or Injury to Persons During Police Action*, (May 31, 2016), http://www.nyc.gov/html/ccrb/downloads/pdf/io_36_16-reporting-investigating-use-of-force.pdf.
[25] Jorgensen et al, *supra* note 1.

Control Weapons (ECWs) states that, at a minimum, ECW training should be consistent with the manufacturer's recommendations and that officers should be recertified each year. The IACP warns that "[f]ailure to provide professionally accepted training exposes the officer, agency, and public to an increased potential for negative outcomes."[26]

55.     Upon information and belief, training on the use of Tasers falls below national training standards set by Police Executive Research Forum ("PERF"). The CCRB Taser Report cites to PERF's "Taser Guidelines" which shares national best practices. The CCRB highlights that PERF has "a more stringent standard than that of the NYPD" on when Taser use is permissible, as the NYPD "allows Taser use when an arrestee may be stiff-arming or squirming, but not exhibiting any intent to harm the arresting officers. PERF, however, states that Conducted Electrical Weapons ("CEW") "should be used only against subjects who are exhibiting active aggression or who are resisting in a manner that, in the officer's judgment, is likely to result in injuries to themselves or others." The CCRB report recommends that the NYPD adopt this national best practice by "caution[ing] officers against using a Taser just because an arrestee has 'tensed.'" [27]

56.     The NYPD Patrol Guide instructs officers on the use of CEWs, commonly referred to as "Tasers." Patrol Guide 221-08 states that CEWs are to be used for subduing aggressive suspects and emotionally disturbed persons, and that CEW use is prohibited in situations that do not require the use of physical force.

57.     NYPD Patrol Guide 221-08 instructs officers to "use a CEW for one standard cycle (five seconds) while constantly assessing the situation to determine if subsequent cycles

[26] IACP Law Enforcement Policy Center, *Electronic Control Weapons Binder*, 7 (March 2018), https://www.theiacp.org/resources/policy-center-resource/electronic-control-weapons.
[27] CCRB, *Taser*, *supra* note 17, at 38-39.

are necessary" and to "consider that exposure to the CEW for longer than fifteen seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury." Officers are required to justify each application of a CEW and they are instructed to weigh other force options before utilizing a CEW.

58.     NYPD Patrol Guide 221-08 further instructs officers to "consider the severity of the offense, the subject's threat level to others, and the risk of serious injury to the subject before deciding to use a CEW on a fleeing subject." Despite this instruction, NYPD officers continue to use Tasers in low-level encounters where the person is not posing a threat to others and with disregard for the risk of serious injury and death.

59.     Further, NYPD Patrol Guide 221-08 makes clear that CEW use is for physically subduing a person, and that "[i]t is strictly prohibited to use the CEW on persons as a form of coercion or punishment." Despite such a clear prohibition on the use of CEWs to punish, NYPD officers continue to use Tasers for the purpose of causing pain and punishing civilians for minor offenses and failing to comply with officers' orders. *See* Ex. D (cataloging publicly available Taser misuse allegations in lawsuits and the news between January 2015 and June 2018)

60.     In particular, NYPD Officers continue to use the drive stun mode, which is when the front electrodes of the CEW are inappropriately used directly on the person in order to cause severe pain, despite the limited legitimate law-enforcement uses of drive stun mode.[28] NYPD Patrol Guide 221-08 explains that "[d]rive stun mode should not be the primary method of use unless exceptional circumstances exist." The Patrol Guide further states that a "Conducted

---

[28] *See, e.g.*, Ex. D at paragraph 12 ("Touch stun" is also used to describe the Taser drive stun mode). *See generally* Ex. D for several lawsuits alleging Taser use in close proximity and repeated cycles where the officers' Taser appears to be for the purpose of causing pain and where the facts plead suggest the officers may have engaged the Taser drive stun mode.

Electrical Weapon (CEW) should never be used in CARTRIDGE or DRIVE STUN mode on a rear-cuffed prisoner."

61.     Axon, the company that manufactures Tasers, provides training materials for law enforcement instructors and users of Tasers. Their training materials, which are attached to this complaint as Exhibit H, advise officers that "[p]hysical resistance alone does not equal an immediate safety risk" and that "[i]f no exigency or immediate safety risk exists, [to] slow down and consider alternative force options." Axon instructs officers to "[a]void repeated, extended, or continuous exposures beyond 15 seconds absent reasonably perceived immediate threat and [upward arrow] justification." Further, Axon instructs officers to use CEW drive stuns only in limited circumstances—to complete a circuit or increase probe spread, as a distraction tactic, or in a brief application to attempt pain compliance—and "not [to] repeat drive stuns if compliance not achieved".

## C. Despite Widespread Chokehold and Taser Misuse, the City Institutes a Policy and Practice of Failing to Investigate, Prosecute, and Discipline Officers for Such Misuse

### i.   Chokeholds

62.     The City and the Supervisory Defendants' failure to investigate, prosecute, and discipline officers for use of prohibited chokeholds resulted in Defendant Nunez repeatedly using the maneuver unlawfully, including against Mr. Medina in July 2018, because he believed that he would not face consequences for it.

63.     The City and the NYPD have been put on notice that the NYPD's disciplinary system contributes to constitutional violations in failing to deter officer misconduct, including excessive force and false statements.

64.     Indeed, in June 2018, NYPD Commissioner James O'Neill commissioned a study of the NYPD's disciplinary system by former federal prosecutors, which highlighted issues of "lack of transparency into the [NYPD's] disciplinary process and its outcomes." Additionally, the report flagged that the Panel could not "evaluate whether appropriate or consistent discipline was imposed generally or in particular cases," due to the Commissioner's broad plenary discretion over individual cases. [29]

65.     Over the past ten years, the CCRB has documented a lack of NYPD enforcement and discipline, despite persistent chokehold complaints. [30]

66.     The CCRB reported in 2014 that "the NYPD disciplinary decisions in NYPD administrative trials of chokehold allegations failed to enforce the clear mandate of the Patrol Guide chokehold rule." The problem's pervasive nature is described by the CCRB as a "systematic refusal to impose discipline in all but the most severe chokehold cases." [31] The CCRB report goes on to explain that "inadequate disciplinary practices transplanted the heart of the chokehold rule during a period in which . . . chokehold incidents were increasing." [32]

67.     The CCRB recommended in 2014 that "[t]he NYPD's blanket prohibition of chokeholds should be restored and uniformly enforced" in the enforcement of discipline and not just in the language of the Patrol Guide. [33]

68.     In 2015, the Office of the Inspector General of the NYPD ("OIG-NYPD") also issued a report on enforcement of the chokehold prohibition from 2009 to 2014. This review

---

[29] Mary Jo White, Robert L. Capers, and Barbara S. Jones, The Report of the Independent Panel on the Disciplinary System of the New York City Police Department (Jan. 25, 2019), https://www.independentpanelreportnypd.net/assets/report.pdf.
[30] CCRB, *A Mutated Rule*, *supra* note 4.
[31] *Id.*
[32] *Id.*
[33] *Id.*

focused on ten complaints of chokeholds that were substantiated by the CCRB. Among the

report's conclusions was that the CCRB and the NYPD had "incongruous approaches for

determining how and when police officers should be held accountable for using chokeholds."[34]

69.     In 2019, OIG-NYPD revisited its recommendations and found that the NYPD was

still partially failing to collaborate and coordinate with the CCRB. While it found that the

reconsideration process had improved the alignment of the two agencies, regarding penalties

recommended and penalties executed, it recommended that the NYPD and the CCRB collaborate

on a set of factors that could be weighed in considering penalties in use of force cases.[35]

70.     However, rather than implement the CCRB's recommendations, upon information

and belief, the NYPD continues to narrowly interpret the chokehold rule and fails to discipline

officers who have used what the Patrol Guide defines as a chokehold. By failing to discipline

officers and continuing use of "an unwritten, much less protective definition" that blurs the lines

of what constitutes a chokehold, the NYPD has signaled to its officers that it will tolerate their

use of chokeholds in all but the most extreme cases.[36]

71.     Additionally, Plaintiff has made a FOIL request for information related to the

City's investigation, prosecution, and discipline of its officers regarding the use of chokeholds,

but the NYPD has not responded to this request. *See* Exs. E and F.

---

[34] NYC Dep't of Investigation, OIG-NYPD, *Observations on Accountability and Transparency in Ten NYPD Chokehold Cases*, iii (Jan, 2015), https://www1.nyc.gov/assets/doi/oignypd/response/chokehold_report_1-2015.pdf.
[35] Press Release, NYC Dep't of Investigation, DOI Issues Fifth Annual Report on Calendar Year 2018 Investigations by its Office of the Inspector General for the New York City Police Department (Apr. 1, 2019), https://www1.nyc.gov/assets/doi/press-releases/2019/April/08OIGNYPDAnnualReport04-01-19.Release.pdf. The OIG-NYPD also notes the same recommendation made by the Blue Ribbon Disciplinary Panel in January 2019. Mary Jo White, Robert L. Capers, and Barbara S. Jones, The Report of the Independent Panel on the Disciplinary System of the New York City Police Department (Jan. 25, 2019), https://www.independentpanelreportnypd.net/assets/report.pdf. It is also the goal of a local law proposed by City Council in 2019. https://www.nydailynews.com/new-york/nyc-crime/ny-metro-city-council-bills-target-nypd-disciplinary-process-20190122-story.html.
[36] CCRB, *A Mutated Rule*, *supra* note 4.

*ii.    Tasers*

72.    In 2016, the CCRB reported that between January 2014 and December 2015, the harshest penalty received for improper Taser usage was "Command Discipline A," or up to five days of lost vacation; the NYPD imposed this on two officers.[37] A third officer was recommended for more training, but that "penalty" was overturned by the commissioner.

73.    These recommended penalties were both subject to the Department Advocate's "reconsideration process" implemented by Deputy Commissioner Kevin Richardson.

74.    More details about the disciplinary outcomes of Taser misuse are not available publicly, at least in part because of the NYPD's own failures in documenting its disciplinary process and outcomes.[38]

75.    Plaintiff has made a FOIL request for information related to the City's investigation, prosecution, and discipline of its officers regarding the misuse of Tasers, but the NYPD has not responded to this request. *See* Exs. E and F.

**D.  Consistent with its Policy and Practice Failures, the City Repeatedly Failed to Discipline Defendant Nunez**

76.    The City and the Supervisory Defendants were aware of Defendant Nunez's extensive history of misconduct at the time of his encounter with Mr. Medina including: (1) 37 allegations of misconduct reported to the CCRB arising out of 17 separate complaints beginning in 2003; (2) at least one modified assignment resulting from a prior use of force; (3) five separate settlements since 2005 arising from Defendant Nunez's conduct, including multiple incidents of alleged excessive force, resulting in the payment of more than $220,000 by the city; and (4)

---

[37] CCRB, *Tasers: An Evaluation of Taser-Related Complaints from January 2014 through December 2015* 35 (Oct. 23, 2016), https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/20161023_taser-report.pdf.
[38] *See* White et al, *supra* note 29 and accompanying discussion.

contradictory testimony under oath in 2009. Several of these incidents are detailed below. Nevertheless, Defendant Nunez was promoted to Detective in 2015 and became a Neighborhood Coordination Officer.

77.     According to a report of CCRB complaints made against Defendant Nunez, on May 8, 2009, Defendant Nunez was accused of using a chokehold. The CCRB investigated the incident. Upon information and belief, Defendant Nunez testified at a CCRB interview under oath about what a chokehold is. The CCRB did not exonerate Defendant Nunez, but also did not substantiate the complaint. There was no penalty as a result of this chokehold incident.

78.     Defendant Nunez gave contradictory testimony on May 29, 2009 in a suppression hearing. The Manhattan District Attorney's office conceded that "[t]here is credible evidence which tends to contradict some of Defendant Nunez's hearing testimony."[39] Upon information and belief, Defendant Nunez was not prosecuted for perjury or penalized for making false statements under oath in court.

79.     According to a lawsuit filed in the Southern District of New York, on March 17, 2005, Defendant Nunez, along with a fellow officer, violently assaulted and struck Mr. Wilkins Cabreja causing severe physical and mental injuries. Mr. Cabreja settled his lawsuit for $100,000.[40] It is unknown whether Defendant Nunez ever faced any administrative penalty for these alleged actions.

80.     According to a lawsuit filed in the Southern District of New York, on November 24, 2007, Defendant Nunez and a fellow officer assaulted and falsely arrested Mr. Steven Soto

---

[39] Letter from the Office of Cyrus Vance, Jr., District Attorney of the County of New York, to the Legal Aid Society (March 22, 2018) (on file with the Legal Aid Society).
[40] Cabreja v. The City of New York, Dkt. 06-CV-2229 (2006), available at https://www.documentcloud.org/documents/4928343-Cabreja-v-City-of-New-York-et-al.

inside a McDonalds restaurant, causing lacerations and bruises to his face, head, jaw, neck, shoulders, and chest, that required treatment at Harlem Hospital Center and Bronx-Lebanon Hospital Center. The complaint states that Defendant Nunez caused Mr. Soto to be falsely prosecuted for resisting arrest and disorderly conduct. Mr. Soto settled his lawsuit for an undisclosed amount.[41] It is unknown whether Defendant Nunez ever received any administrative penalty for these alleged actions.

81.     According to a lawsuit filed in the Southern District of New York, on December 9, 2009, Defendant Nunez, in concert with other officers, used excessive force on and carried out the false arrest of Wellington Antun, a Hispanic man. Mr. Antun was walking down the street in the Inwood neighborhood of Manhattan when several plainclothes officers, including Defendant Nunez, commanded Mr. Antun to come towards them. The lawsuit states that the officers did not identify themselves as police, and Mr. Antun was afraid for his safety and began running the other way, but that he stopped when the officers identified themselves as NYPD. The complaint states that the officers struck Mr. Antun in the head with the butt of a gun, knocked him to the ground, kicked him repeatedly in the ribs, and punched him in the face, causing Mr. Antun to suffer a concussion, head trauma, bruises, lacerations that required medical attention, including three staples in his head. The complaint further states that the officers arrested him and charged him with Criminal Possession of a Controlled Substance, despite the fact that Mr. Antun did not possess any controlled substances. The criminal charges were later dismissed. Mr. Antun settled his lawsuit for $60,000.[42]

---

[41] Soto v. The City of New York, Dkt. 08-CV-6624 (RJH)(DFE) (2008), available at
https://www.documentcloud.org/documents/5379205-Soto-v-The-City-of-New-York-et-al.
[42] Antun v. City of New York, Dkt. No. 10-CV-07137, paragraphs 13-24, available at
https://www.documentcloud.org/documents/4928346-Antun-v-The-City-of-New-York-et-al.

82.     According to Defendant Nunez's Internal Affairs Bureau file, on December 30, 2009, he was placed on "Modified Assignment" in response to a use of force allegation arising from the above-described arrest of Wellington Antun. The Internal Affairs Bureau records report that Mr. Antun was injured in NYPD custody after being hit while handcuffed by arresting officers, including Defendant Nunez.

83.     According to a lawsuit filed in the Southern District of New York in 2010, Defendant Nunez violated the civil rights of Mr. Abel Adames, resulting in a settlement of $20,000.[43] It is unknown whether Defendant Nunez was ever penalized for these allegations.

84.     According to a lawsuit filed in the Bronx County Supreme Court, on February 10, 2016, Defendant Nunez along with fellow officers violently assaulted, battered, and falsely arrested Mr. Luis Martinez and Prisca Martinez, causing severe injuries that required extensive medical and hospital treatment. The complaint further states that Defendant Nunez and fellow officers entered the Martinez's home, destroyed furniture, and stole cash and valuable jewelry. Luis and Prisca Martinez settled their lawsuit for $40,000.[44] It is unknown whether Defendant Nunez was ever penalized for these alleged actions.

85.     According to his CCRB Officer History, Defendant Nunez was again accused of using a chokehold on October 9, 2018, just months after the incidents underlying this complaint. The use of force in this incident was also video documented, and a CCRB investigation is pending.

---

[43] Adames v. The City of New York, Dkt. No. 10-CV-07966 (2011), available at https://www.documentcloud.org/documents/4928349-Adames-v-The-City-of-New-York-et-al.
[44] Martinez v. NYPD, 2013 WL 420619 (N.Y.Sup. 2013), available at https://www.documentcloud.org/documents/4928350-Martinez-et-al-v-City-of-New-York-et-al.

**E.  The Inevitable Culmination of the City's Policies, Procedures, and Culture
Surrounding Chokehold and Taser Use Is Defendant Nunez's Assault on Mr. Medina**

86.     On the evening of July 14, 2018, Defendants Fabio Nunez and Shanee Hansler

were both on the "overtime post" for the Neighborhood Coordination Unit. Ex. B at

Mukhtarzada 2, 23:55. They were driving around the Washington Heights neighborhood of

Manhattan when they heard music playing and decided to investigate.

87.     There had been no noise complaint that drew their attention. Ex. G, Nunez, CCRB

interview at 15:45.

88.     Upon arrival at the scene at approximately 11:39 P.M., Defendants Nunez and

Hansler found the Plaintiff, Tomas Medina, a 33-year-old male, hanging out with friends outside

the El Mundo Car Dealership, at or around 438 West 206th Street. Mr. Medina and his friends

were listening to music on a speaker owned by the dealership—as they, and many other

neighborhood residents, routinely do on weekends in the Heights. Ex. A at Front, at 11:35 P.M.

89.     Mr. Medina's friend, Herman Garcia, owns the car dealership, and Mr. Medina

was present with Mr. Garcia's permission. The dealership was closed, and Mr. Medina's friend

Esmeralda Rodriguez had parked her Jeep in front of the dealership with the owner's permission.

Neither Mr. Medina nor any of his friends were engaging in any criminal activity.

90.     Nunez and Hansler confronted Mr. Medina and his friends and asked whose

speaker was playing music. Ex. B at Pierce, 23:42. After identifying the speakers as belonging to

the car dealership, Mr. Medina told the officers that he was already packing up the sound

equipment. An officer asked for Mr. Medina's ID and the ID of the business owner's brother

who was also present.

91.     Defendants Nunez and Hansler told Mr. Medina that "people are calling about the music outside," Ex. B at Pierce, 23:42, despite not having received any specific complaint about the music, Ex. G, Nunez, CCRB interview at 15:45. Ms. Rodriguez said in Spanish "But we're stopping the music" and Defendant Nunez replied in Spanish "That isn't important" and something to the effect of "What's important is you give me an ID now." Ex. B at Pierce, 23:45.

92.     Defendant Nunez then removed the speaker from the sidewalk and walked it towards his unmarked police car. Defendant Nunez came back to the sidewalk without the speaker and said "You're going to get a summons for the loud music." Ex. B at Pierce, 23:46. Mr. Medina continued peacefully speaking with the officers, trying to explain that it was not his music and not his speaker. At no time did he approach either officer with any threat of violence. Ex. B at Pierce.

93.     Defendant Nunez then started speaking in English and Ms. Rodriguez protested and reminded him that Mr. Medina doesn't speak English. Defendant Nunez responded "Well that's his problem. I don't have to speak Spanish to you." Ex. B at Pierce, 23:48. He then continued in English, despite knowing Mr. Medina doesn't understand English, "Okay this is very simple. You're going to fuck with me, right? … I'm going to ask you this because now it's going to be with you. You give me a real name, you get a charge. You understand me? That's what it's going to be, like that." Ex. B at Pierce, 23:48.

94.     Mr. Medina replied in Spanish, and asked again why Defendant Nunez needed his identification. Defendant Nunez replied "Because the police department said that I need an ID. Now you better give me an ID." Ex. B at Pierce, 23:48.

95.     While trying to explain to Defendant Nunez that the music was not his, Mr. Medina and his friends continued pack up the area—unplugging the speaker, rolling up extension

cords, and compressing folding chairs. As Defendant Nunez continued talking to Ms. Rodriguez, Mr. Medina picked up one of the chairs sitting outside the dealership to bring it inside. Mr. Medina turned away from Defendant Nunez to do so. Defendant Nunez followed Mr. Medina and pushed him into a car parked in the dealership to allegedly pursue him for being "disorderly." There was no crowd gathered at this point. Ex. A at Front, 11:46 P.M.; Ex. B at Pierce, 23:48.

96.     Defendant Nunez grabbed Mr. Medina by the neck with his right hand, held handcuffs against Mr. Medina's neck, and menaced Mr. Medina by placing a Taser on his side. The pressure from the handcuffs caused pain to Mr. Medina's neck. The momentum from Defendant Nunez's shove caused Mr. Medina's hat to fall off, at which time Mr. Medina grabbed his hat and turned to Defendant Nunez. Defendant Nunez's right hand remained on Mr. Medina's neck during this time, pressing his handcuffs against Mr. Medina's spine. Mr. Medina then briefly raised his arms in a pleading gesture and shook his head before turning back to the car. Mr. Medina kept his arms raised at a distance from Defendant Nunez throughout the encounter. While this was happening, Ms. Rodriguez retrieved her driver's license and tried to show it to the police officers in order to stop their violence. Ex. A at Front at 11:48.

97.     Without further warning and without any reason to believe deadly force was necessary, while Mr. Medina was still pinned against the parked car, Defendant Nunez placed Mr. Medina in a chokehold. Defendant Nunez wrapped his right arm tightly around Mr. Medina's neck for approximately 23 seconds. The pressure around Mr. Medina's neck caused his entire body to jerk backwards away from the car and downward. At the same time, Defendant Nunez used a Taser on Mr. Medina's back. Mr. Medina had difficulty breathing during this time, and feared for his life.

27

98.     Defendant Hansler was standing by Defendant Nunez and Mr. Medina throughout their interaction, and grabbed and lowered Mr. Medina's left hand while Defendant Nunez was choking him. Defendant Hansler did not make any attempt to stop Defendant Nunez's use of force. While this was happening, Ms. Rodriguez continued to reiterate that the music was hers, stating "He don't do nothing wrong. Excuse me. I said it's mine." Ex. B at Pierce, 23:49.

99.     While using a chokehold, Defendant Nunez tased Mr. Medina thirteen times and Ms. Rodriguez once. Surveillance footage shows that Defendant Nunez discharged his Taser from a close proximity of no more than an arm's length distance, despite Taser training recommendations to avoid close-range deployment. Ex. A at Front at 23:49-50; Ex. H, Axon Training Materials.

100.    The Taser report created following the incident documents that 14 cycles were discharged; 13 of these cycles were each sustained for the full five-second maximum. The report also documents that "the majority of the discharges happened in two specific intervals between 23:53:56 and 23:54:55 (six trigger pulls at five-second cycles each) and between 23:56:01 and 23:56:26 (four trigger pulls at five-second cycles each)," despite NYPD Patrol Guide 221-08's instruction for officers to evaluate each discharge before additional Taser use and the Taser manufacturer's recommendation to "[a]void repeated drive-stuns if compliance not achieved."

101.    While Defendant Hansler attempted to twist Mr. Medina's arm backwards, Defendant Nunez forcefully grabbed Mr. Medina's arm, and then tased him from behind in the back. Mr. Medina's body jerked in response to being tased. Fearing for his safety and trying to escape the violence, Mr. Medina moved backwards between the cars. Defendant Nunez pursued him, shooting him with the Taser multiple times. Mr. Medina told Defendant Nunez that he was calm, and asked not to be tased again. Ms. Rodriguez screamed several times, "Listen. It's mine.

28

I told you it's mine." Ex. B at Pierce, 23:50. Defendant Nunez then used a second chokehold on Mr. Medina, again placing Mr. Medina in fear for his life. As a result of this attack, Mr. Medina was left with burn marks across his back, and cuts and bruises all over his body.

102.   Defendant Hansler eventually called for backup, and over 20 officers arrived in response, including 34th precinct officers Michael Levy, Kevin McCormack, Daniel Martinucci, Christopher Siciliano, James Ludvick, Juan Orozco, Kevin Falconer, Paul Montali, Matthew Robayo, Nay Htoo, Angela Polancobrito, James Kane, Emilio Pichardo, Giancarlo Alia and Michael Quinones, in addition to several unknown officers.

103.   Defendant Mukhtarzada was the supervisor on the scene responsible for investigating Defendant Nunez's use of force, supervising the collection of evidence and witness testimony, and supervising the behavior of all the officers on the scene. When bystanders accused Defendant Nunez of using a Taser at least seven times that they observed, the responding sergeant, Defendant Mukhtarzada, dismissed the information from potential witnesses, thereby impeding an investigation into Defendant Nunez's Taser use. The Sergeant responded, "They did tase him. They absolutely tased him. But they didn't tase him seven times. We don't tase seven times." Ex. B at Mukhtarzada 2, 00:03.

104.   Mr. Medina was also invasively searched by Defendant Christopher Siciliano and Defendant Nay Htoo, who both participated in pulling Mr. Medina's pants down around his ankles. His pants were around his ankles as he walked into the precinct and the officers left his pants around his ankles while he stood handcuffed to a post in a high-traffic corridor. The officers did this specifically to punish and humiliate Mr. Medina.

105.     Another officer whose name is unknown, but who is approximately six feet tall and has brown skin and black hair, slapped the back of Mr. Medina's head causing his head to slam into a car hood when he was handcuffed. Ex. B at Falconer, 23:55.

106.     During the course of the incident, several civilians stopped due to the commotion and began to record the events. Seeking to protect their colleague and knowing that Defendant Nunez's conduct was unlawful, officers blocked, threatened and otherwise prohibited civilians from exercising their right to record the police abusing Mr. Medina.

107.     Bystanders yelled to the police "Don't shoot him. Don't shoot him. Don't shoot." Officer Polancobrito repeatedly told bystanders to "back away" and started to make them back away further and further down the sidewalk to obstruct their view of Mr. Medina's arrest. Ex. B at Polancobrito, 23:53. When the bystanders tried to appeal to Officer Polancobrito's humanity, she replied "No, I'm not a human. No. You are not either. . . . I'm a cop. I'm not a human." Ex. B at Polancobrito, 23:54. After Polancobrito and another officer were away from the group of bystanders, they repeatedly referred to them dismissively as "perps." Ex. B at Polancobrito, 23:55-56.

**F.  Defendant Nunez Filed False Charges Against Mr. Medina to Distract from His Own Misconduct**

108.     Defendant Nunez, based on his extensive experience with going through the NYPD disciplinary process, took steps to cover up what he knew was an excessive amount of force.

109.     In the car on the way back to the precinct, Defendant Nunez told Hansler that "I would have choked him but I didn't want to do that because you would have get in trouble." Ex.

B at Nunez 3, 23:59. During his interview with the CCRB, however, Defendant Nunez refused to admit that he used a chokehold. Ex. G, Nunez, CCRB interview at 46:44.

110.    Mr. Medina was arrested and taken to the 34th Precinct on the charges of assault in the second degree, attempted resisting arrest, attempted obstructing governmental administration, and attempted disorderly conduct. His arrest number was M18637406. The name of the arresting officer in his arrest paperwork is David Callan, Shield 16363. Mr. Medina was charged with two counts of assault in the second degree and one count of resisting arrest in New York Criminal Court, Docket 2018NY029824.

111.    Defendant Jose A. Gomez interviewed Mr. Medina in the 34th precinct after the incident in an attempt to get a statement that would assist in the cover-up of the unlawful use of force.

112.    The criminal complaint falsely states that Mr. Medina bit Defendant Nunez's finger, scratched Defendant Nunez on the bicep, and struck Defendant Hansler in her left eye causing bruising. This statement is the result of intentional lies—Mr. Medina did not use any physical violence against Defendant Nunez or Defendant Hansler. Blurry photographs of Defendant Nunez's finger were taken at the precinct; however, upon information and belief, no photographs of Defendant Hansler's supposed injuries were ever taken.

113.    Mr. Medina was falsely arrested, falsely imprisoned, and subjected to abuse of process based on false statements made in police officers' paperwork and to the Manhattan District Attorney's office. The charges were brought against him solely for the purpose of distracting from Defendant Nunez's unlawful use of force, most notably the chokeholds, and to aid Defendant Nunez in avoiding further discipline that could endanger his career or pension.

114.     Defendant Nunez's actions have robbed Mr. Medina of over a year of his life, in which he has been subjected to criminal prosecution that has caused him mental anguish and prevented him from moving forward from this incident. Felony assault charges were dismissed in December 2018. And after appearing in Manhattan Supreme Criminal court at least eight times since July 2018, on October 3, 2019, Mr. Medina consented to an adjournment in contemplation of dismissal of the remaining misdemeanor assault, resisting arrest, and disorderly conduct charges.

**G.  The Conflicting Treatment by the NYPD and CCRB Investigations of Nunez's Force Underscores the NYPD's Disciplinary Failures**

115.     Since Mr. Medina's arrest, the City and Supervisory Defendants and other agents, employees, and/or officers, have (1) failed to properly investigate this incident, particularly the obviously excessive Taser usage and improper chokehold; and (2) attempted to cover up the misconduct by (i) wrongly concluding Mr. Medina was lawfully being detained for failing to submit his identification, (ii) wrongly concluding that a chokehold was a necessary type of force in this context, (iii) wrongly concluding that Nunez's use of the Taser was proper in this context, (iv) withholding portions of relevant body camera footage and IAB and CCRB records from Mr. Medina in criminal court, thereby delaying his prosecution by months, (v) unlawfully accessing sealed arrest records during the investigation, and (vi) wrongly closing the investigation without recommending Defendant Nunez for administrative charges.

116.     Chief of Department Terrance Monahan concluded in August 2018 that Nunez's use of force was "necessary" and publicly defended him in the media. The NYPD's Deputy Commissioner of Public Information issued an official statement, approved by Commissioner O'Neill, that "Despite officers' continued attempts to deescalate the situation, the suspect

continued to resist the arrest, leaving the officers no choice but to use physical force. The suspect was eventually taken into custody uninjured, internal affairs is investigating,"[45] Upon information and belief, O'Neill also made defensive remarks regarding the incident at press conferences in August 2018.

117.    An Internal Affairs Bureau investigation exonerated Nunez for all uses of the Taser but "sustained" the complaint about the chokehold. Upon information and belief, Deputy Commissioner Kevin Richardson's Department Advocate has not pursued charges based on the IAB's finding of an improper chokehold.

118.    Meanwhile, CCRB allegations regarding the same Taser usage were substantiated. The CCRB is moving forward with charges against Nunez for the first chokehold and for the fourteen Taser shots, including the indiscriminate drive stunning.[46]

## H. Mr. Medina Suffered Physical and Emotional Damages, Continues to Suffer, and Reasonably Fears Future Police Brutality in Washington Heights

119.    Mr. Medina still experiences pain in his neck, as well as fear of the police, and fear of enjoying company in public. Mr. Medina feels he can no longer trust the police to be honest in his interactions with him, and can no longer contact the police if he is in need of help, because he fears that they will be hostile to him. As a result of this incident, Mr. Medina has suffered loss of liberty, mental anguish, emotional distress, physical and emotional pain, and suffering from the incident and its aftermath, including months later: loss of civil rights, loss of

---

[45] Marcia Kramer, *Battle Brewing Over NYPD Detective's Actions After Alleged Use of Chokehold During Arrest*, CBS N. Y. (Aug. 13, 2018, 7:35 P.M.), https://newyork.cbslocal.com/2018/08/13/nypd-chokehold-arrest-tomas-medina/.

[46] Ali Winston, *Despite Eric Garner and 'I Can't Breathe,' Chokeholds Still Used*, N.Y. TIMES (May 9, 2019), https://www.nytimes.com/2019/05/09/nyregion/eric-garner-death-chokeholds.html.

services, interference with familial relationships, interference with gainful employment, embarrassment, and humiliation.

120.    After the incident, Mr. Medina feared returning to the weekly gatherings at El Mundo and could not return to work detailing cars because of his shoulder pain. After a few months, he returned to El Mundo for work and Saturday barbeques, but remains fearful of attracting police attention and being brutalized again in the future. Mr. Medina intends to continue enjoying his evenings with his friends, despite his fears and his high risk of future harm.

   i.   *The NYPD's Historical and Ongoing Approach of Broken Windows Policing Makes it More Likely that Mr. Medina Will Be Re-Victimized*

121.    Mr. Medina's fear of re-victimization is reasonable and credible, especially because he was not engaged in criminal conduct when Defendant Nunez assaulted him. Accordingly, Mr. Medina knows that police encounters and officers' improper uses of force are not dependent on the presence of criminal conduct.

122.    Policing of non-criminal conduct, particularly in communities of color, is a historical norm for the NYPD. In 1994, the NYPD began targeting what it characterized as "quality-of-life offenses" such as marijuana possession and urinating in public, to drive down felony-level crime.[47]

123.    Since 1994, there has been a 500% increase in summons activity under this "quality-of-life" policing theory that expanded targeting of public offenses.[48]

---

[47] Mark G. Peters, and Philip K. Eure, An Analysis of Quality-of-Life Summonses, Quality-of-Life Misdemeanor Arrests, and Felony Crime in New York City, 2010-2015 (Jun. 22, 2016), 8-9, https://www1.nyc.gov/assets/doi/reports/pdf/2016/2016-06-22-Pr18oignypd_qualityoflife_report.pdf.
[48] *Stinson v. City of New York*, Dkt. 10-CV-04228 ¶ 48 (S.D.N.Y. 2010), https://www.clearinghouse.net/chDocs/public/PN-NY-0012-0001.pdf. Many summons are issued without probable cause or any legitimate basis. Between 2004 and 2009, 6.2% of summons filed were dismissed as defective and 17.2% were dismissed prior to arraignment as facially insufficient. The number dismissed before trial was consistently over 50%. *Id.* at ¶ 5.

124.     Consistent with an emphasis on policing "quality-of-life offenses," NYPD supervisors have historically pressured officers into issuing summonses at high volumes in order to inflate their commands' officer activity.[49] This type of aggressive policing of low-level, non-violent conduct occurs disproportionately in communities of color and has resulted in tragedies, including the killing of Eric Garner.[50]

125.     A 2017 lawsuit targeted the Department's policies in pressuring officers to issue summons. The lawsuit's settlement ended daily reporting requirements of officers, among other reforms.[51]

126.     However, the pressure on officers to issues summonses persists. Text messages from a Manhattan lieutenant in 2018 demonstrate how NYPD officers continue to face pressure from supervisors to give people summonses.[52] Punishment for failure to meet productivity goals may include undesirable posts, lost overtime, and being passed over for promotions.[53]

127.     Under Mayor Bill de Blasio, the NYPD has continued its approach to broken windows policing, which the Mayor has described as "address[ing] the little things that come from big things. You respond to quality of life concerns that come from the community."[54]

---

[49] *See id.*; *Raymond v. City of New York*, 1:15-CV-06885 (S.D.N.Y. 2015).
[50] Saki Knafo, *A Black Police Officer's Fight Against the NYPD*, N.Y. TIMES (Feb. 18, 2016), https://www.nytimes.com/2016/02/21/magazine/a-black-police-officers-fight-against-the-nypd.html.
[51] Stip. & Proposed Prelim. Approval Order, Stinson v. City of New York, Dkt. 10-CV-04228 (S.D.N.Y. 2010), ECF No. 319-1 at ¶¶ 7-8.
[52] George Joseph, *NYPD Commander's Text Messages Show How the Quota System Persists*, THE APPEAL (Dec. 12, 2018), https://theappeal.org/nypd-commanders-text-messages-show-how-the-quota-system-persists/.
[53] *Id.*
[54] Darren Sands, *De Blasio: Broken Windows Policing "Got A Bad Name," But It Had the Right Underlying Principle,* BuzzFeed News (Aug. 8, 2017), https://www.buzzfeednews.com/article/darrensands/de-blasio-broken-windows-policing-got-a-bad-name-but-it-had.

128.    Upon information and belief, in addition to being deployed disproportionately in communities of color, these policing strategies disproportionately impact men of color, like Mr. Medina.

129.    Neighborhood Coordination Officers ("NCOs") were introduced under DeBlasio in 2016 to address community frustrations and eroded trust from over-policing. NCOs are officers who have more discretion to treat "conditions" rather than only using arrests and summonses to enforce laws.

130.    Noise complaints are one of the many types of public offenses or "conditions" NCO's are assigned to correct. Patrol Guide Section 214-23 specifically instructs officers to allow someone accused of a noise complaint to attempt to cure the condition. Officers are instructed to issue a summons only if the person is unable to correct the condition.

131.    Defendant Nunez, was an NCO on the night of July 14, 2018, when he failed to adhere to the clear instructions of the Patrol Guide. Instead, Defendant Nunez chose to prolong and escalate the encounter with Mr. Medina and his friends. Defendant Nunez's actions in this case underscore the predictable result of ongoing pressure on officers to produce "activity" or meet quotas, even after the 2017 reforms.[55]

132.    The NYPD's continued policy of targeting "quality-of-life" offenses results in continued pressure on officers to document their quality-of-life enforcement through summons activity. This pressure motivated Defendant Nunez and Defendant Hansler to aggressively pursue Mr. Medina's identification in order to give him a summons, despite the music being eliminated and despite Mr. Medina not owning the speaker nor the source of the music.[56] These

---

[55] See Complaint, *Stinson v. City of New York*, *supra* note 48; Knafo, *supra* note 50.
[56] Knafo, *supra* note 50.

same policies and officer incentives make it highly likely that Mr. Medina will face the effects of

over-policing, including excessive force, again, until a change is made.[57]

    ii.    *The 34th Precinct Has a Reputation in the Community that Also Causes Mr. Medina to Fear Being Re-Victimized*

133.    Despite his desire to continue visiting his friends and workplace in the 34th

precinct, Mr. Medina is reasonably afraid. His fears are exacerbated by the reputation of 34th

precinct officers for aggressively approaching members of the community about non-criminal

conduct, such as playing music. These encounters hold the potential to—and do—escalate into

uses of force against civilians like Mr. Medina.

134.    Mr. Medina and his friends who hang out at El Mundo are aware of 34th precinct

officers' reputation for brutality, lies, and corruption. Mr. Medina and others who spend time in

the neighborhoods policed by the 34th precinct often feel that the police officers who patrol their

neighborhood stereotype them as perpetrators and criminals. They have heard officers say things

to that effect, including in this case, where Officer Polancobrito described bystanders trying to

film Mr. Medina as "not human" and just "perps." Ex. B at Polancobrito, 23:55-56.

135.    The 34th Precinct, led by Deputy Inspector Peter Andrea, is located in the

northern-most portion of Manhattan, including the Inwood, Fort George, and Hudson Heights

neighborhoods. According to the CCRB's 2018 Annual Report, civilian complaints arising out of

incidents in the 34th Precinct have increased in the past three years.[58]

---

[57] *See, e.g.*, William Terrill and Michael D. Reisig, *Neighborhood Context and Police Use of Force*, 40 J. RESEARCH CRIME & DELINQUENCY 291 (2003) ("Officers are more forceful in areas characterized by high levels of disadvantage and crime—irrespective of suspect behavior at the police-suspect encounter level."); *accord* The National Academies of Sciences, Engineering, and Medicine, *Proactive Policing: Effects on Crime, Communities, and Civil Liberties* 281 (David Weisburd & Malay K. Majmundar, eds., 2018).

[58] *See* CCRB, *Table 13A: Where Incidents that Led to a Complaint Took Place by Precinct – Manhattan 2014 – 2018*, in *Appendix, CCRB Complaint Data 2018*, 28 (Jan 10, 2019, 12:00 AM), https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2018_annual-appendix.pdf.

**CAUSES OF ACTION**

**FIRST CLAIM: MONELL CLAIM UNDER 42 U.S.C. §1983**

136.     Plaintiff repeats and realleges each and every allegation set forth above as if set forth herein.

137.     Defendants, individually and collectively, were acting under color of state law, as officers of the NYPD, when they carried out the acts complained of herein.

138.     Defendant City of New York engages in a policy-in-practice, custom, usage, or practice, of subjecting citizens to excessive force, including prohibited manners of force like chokeholds and excessive Taser-use.

139.     The NYPD's practice and custom of officers unlawfully using chokeholds and Tasers is so persistent, widespread, and pervasive as to constitute a custom or usage and imply the constructive knowledge or acquiescence of the City and its policymakers. The numerous instances of abuse, several of which are described above, along with city agency reports, civilian lawsuits and complaints, and news articles, demonstrate that the City has been, or should have been, aware of the constitutional violations committed by the NYPD. The constitutional violations, predicated upon the Fourth and Fourteenth Amendment, are so numerous, persistent, and pervasive that the need for corrective action is obvious. The City's failure to take any such action, through training, enhanced supervision, diligent investigation, or meaningful punishment—in particular, disciplinary action that would deter future misconduct—constitutes deliberate indifference to the violations. This deliberate indifference to the NYPD's widespread violations of constitutional rights can be considered a policy, practice, or custom of the City.

---

(64 complaints were filed in 2018 and 62 complaints were filed in 2017, compared to 41 complaints in 2016 and 51 complaints in 2015).

140.     Additionally, the City knew, or should have known, of Defendant Nunez's propensity to engage in the type of misconduct alleged by Plaintiff. Despite the City's knowledge of Defendant Nunez's past misconduct and violence, the City and the NYPD failed to take any action to discipline Defendant Nunez or correct his behavior. This is indicative of the City's policy, custom, usage, practice, and/or rule of displaying a willful indifference to the proper training, supervision, discipline, and retention of its employees.

141.     The City's failure to train, supervise, investigate, and discipline NYPD officers amounts to deliberate indifference to the constitutional violations committed by the NYPD against individuals including Mr. Medina.

142.     Defendant City's improper and inadequate policies, customs, usages, practices, rules and/or regulations were the direct and proximate cause of violations of Plaintiff's civil rights.

143.     As a result of the violation of his civil rights, Plaintiff suffered significant physical and emotional pain, humiliation, and trauma.

144.     Plaintiff seeks compensatory damages, punitive damages, and permanent injunctive relief from the City of New York.

**SECOND CLAIM: EXCESSIVE FORCE UNDER 42 U.S.C. § 1983**

145.     Plaintiff repeats and realleges each and every allegation set forth above as if set forth herein.

146.     The level of force applied by Defendant Nunez was objectively unreasonable, excessive, and unjustified and deprived Plaintiff of his constitutional rights as guaranteed under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.

39

147. Defendant Nunez brutally and improperly placed Mr. Medina in a chokehold and tased him thirteen times. Mr. Medina was left with burns on his back and chest and bruising.

148. Defendant John Doe slapped Mr. Medina in the back of the head while handcuffed, causing his head to slam against the hood of a car.

149. As a result of Defendants' actions, Plaintiff suffered significant physical and emotional pain, humiliation, trauma, and deprivation of his constitutional rights.

150. Plaintiff seeks compensatory damages from Defendants O'Neill, Monahan, Mukhtarzada, Gallagher, Gomez, Nunez, Hansler, Htoo, Siciliano, and John Doe; punitive damages from Defendants Nunez, Hansler, Htoo, Siciliano, and John Doe; and injunctive relief from the City.

## THIRD CLAIM: FALSE SEARCH AND ARREST UNDER 42 U.S.C. § 1983

151. Plaintiff repeats and realleges each and every allegation set forth above as if set forth herein.

152. Defendant Nunez had no probable cause to arrest Mr. Medina, nor did he have justification to detain him. Mr. Medina had not committed an illegal action which required a summons, as Patrol Guide Section 214-23 specifically instructs officers to issue a summons for a noise violation only if the condition has not been cured. Here, Mr. Medina and his friends immediately turned off the music when asked to do so, and began to pack up the speaker. Further, because the speaker belonged to the dealership and the music belonged to Mr. Medina's friend, facts of which Defendant Nunez was made aware, Defendant Nunez had no basis to issue a summons for a noise violation to Mr. Medina.

153.     Defendants Htoo and Siciliano conducted improper searches on Mr. Medina. Defendants exacerbated their improper searches by needlessly pulling Mr. Medina's pants down and leaving his pants hanging down, including in a well-trafficked hallway.

154.     As a result of Defendants' actions, Plaintiff suffered loss of liberty, humiliation, emotional pain and trauma, and deprivation of his constitutional rights, and injunctive relief from the City.

155.     Plaintiff seeks compensatory damages from Defendants O'Neill, Monahan, Mukhtarzada, Gallagher, Gomez, Nunez, Hansler, Callan, Htoo, and Siciliano; punitive damages from Defendants Nunez, Hansler, Callan, Htoo, and Siciliano; and injunctive relief from the City.

## FOURTH CLAIM: FAILURE TO INTERVENE UNDER 42 U.S.C. § 1983

156.     Plaintiff repeats and realleges each and every allegation set forth above as if set forth herein.

157.     Defendants who observed the unlawful conduct and had an opportunity to intervene violated Plaintiff's rights under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments by failing to uphold their duty to intervene and prevent such conduct.

158.     As a result of Defendants' actions, Plaintiff suffered significant physical and emotional pain, humiliation, trauma, and deprivation of his constitutional rights.

159.     Plaintiff seeks compensatory and punitive damages from Defendant Hansler and injunctive relief from the City.

## FIFTH CLAIM: STATE LAW ASSAULT AND BATTERY

160.     Plaintiff repeats and realleges each and every allegation set forth above as if set forth herein.

161.    Defendant Nunez intentionally touched Mr. Medina in a harmful and offensive manner without his consent when he placed him in a chokehold and tased him thirteen times. This excessive use of force against Mr. Medina constituted an assault and battery.

162.    Defendant Nunez was acting in his official capacity as an NYPD officer when he assaulted and battered Mr. Medina, and Defendant City of New York, as the employer of Defendant Nunez, is liable for his actions under the doctrine of respondeat superior.

163.    As a result of Defendants' actions, Plaintiff suffered significant physical and emotional pain, humiliation, trauma, and deprivation of his constitutional rights.

164.    Plaintiff seeks compensatory damages from the City and Defendants Nunez, Hansler, Htoo, Siciliano, and John Doe; punitive damages from Defendants Nunez, Hansler, Htoo, Siciliano, and John Doe, and injunctive relief from the City.

## SIXTH CLAIM: STATE LAW FALSE ARREST AND FALSE IMPRISONMENT

165.    Plaintiff repeats and realleges each and every allegation set forth above as if set forth herein.

166.    Defendants' wrongful and illegal arrest and detainment of Plaintiff constitutes a false arrest and imprisonment. As detailed above, Defendant Nunez had no probable cause to arrest Mr. Medina, nor did he have justification to detain him.

167.    Plaintiff was conscious of his confinement and did not consent to it.

168.    Defendants were acting in their official capacity as NYPD officers when they falsely arrested and imprisoned Mr. Medina, and Defendant City of New York, as the employer of Defendants, is liable for their actions under the doctrine of respondeat superior.

169.    As a result of Defendants' actions, Plaintiff suffered significant humiliation, trauma and emotional pain, and deprivation of his constitutional rights.

170.    Plaintiff seeks compensatory damages from the City and Defendants Nunez, Hansler, Callan, Htoo, and Siciliano; punitive damages from Defendants Nunez, Hansler, Callan, Htoo, and Siciliano; and injunctive relief from the City.

## SEVENTH CLAIM: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

171.    Plaintiff repeats and realleges each and every allegation set forth above as if set forth herein.

172.    By using unreasonable force on and falsely arresting, searching, and imprisoning Plaintiff, and failing to prevent other Defendants from doing so, Defendants committed improper conduct sufficient to constitute the intentional infliction of emotional distress upon Plaintiff.

173.    Defendants were acting in their official capacity as NYPD officers when they intentionally inflicted emotional distress upon Mr. Medina, and Defendant City of New York, as the employer of Defendants, is liable for their actions under the doctrine of respondeat superior.

174.    As a result of Defendants' actions, Plaintiff suffered significant humiliation, trauma and emotional pain, and deprivation of his constitutional rights.

175.    Plaintiff seeks compensatory damages from the City and Defendants Nunez, Hansler, Htoo, Siciliano, and John Doe; punitive damages against Defendants Nunez, Hansler, Htoo, Siciliano, and John Doe; and injunctive relief from the City.

## EIGHTH CLAIM: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

176.    Plaintiff repeats and realleges each and every allegation set forth above as if set forth herein.

177.    By using unreasonable force on and falsely arresting, searching, and imprisoning Plaintiff, and failing to prevent other Defendants from doing so, Defendants were negligent in committing conduct that inflicted emotional distress upon Plaintiff.

178.     Defendants were acting in their official capacity as NYPD officers when they negligently inflicted emotional distress upon Mr. Medina, and Defendant City of New York, as the employer of Defendants, is liable for their actions under the doctrine of respondeat superior.

179.     As a result of Defendants' actions, Plaintiff suffered significant humiliation, trauma and emotional pain, and deprivation of his constitutional rights.

180.     Plaintiff seeks compensatory damages from the City and Defendants Nunez, Hansler, Htoo, Siciliano; and John Doe; punitive damages from Defendants Nunez, Hansler, Htoo, Siciliano; and John Doe; and injunctive relief from the City.

## NINTH CLAIM: NEGLIGENT RETENTION AND PROMOTION

181.     Plaintiff repeats and realleges each and every allegation set forth above as if set forth herein.

182.     By unreasonably retaining Defendant Nunez, promoting him to Detective, and appointing him a Neighborhood Coordination Officer despite his history of complaints and unfavorable settlements, Defendants were negligent in retention and promotion decisions.

183.     Defendant Nunez was acting in his capacity as an employee of the Defendants at the time of the incident.

184.     Defendants knew or should have known of Defendant Nunez's propensity for violence and misconduct, due to the extensive history of complaints and adverse settlements against him.

185.     Defendant Nunez's assault and battery, false arrest and false imprisonment, intentional infliction of emotional distress, and negligent infliction of emotional distress occurred using Defendants' chattels, including but not limited to their Taser and handcuffs.

44

186.    As a result of Defendants' actions, Plaintiff suffered significant humiliation, trauma and emotional pain, and deprivation of constitutional rights.

187.    Plaintiff seeks compensatory damages and injunctive relief from the City.

## TENTH CLAIM: NEGLIGENT TRAINING

188.    Plaintiff repeats and realleges each and every allegation set forth above as if set forth herein.

189.    Upon information and belief, the City failed to use reasonable care in the training and supervision of Defendant Nunez and the other NYPD officers named in this action who assaulted and humiliated Mr. Medina.

190.    As a result of the City's inaction, Plaintiff suffered significant humiliation, trauma and emotional pain, and deprivation of his constitutional rights.

191.    Plaintiff seeks compensatory damages and injunctive relief from the City.

## ELEVENTH CLAIM: ABUSE OF PROCESS

192.    Plaintiff repeats and realleges each and every allegation set forth above as if set forth herein.

193.    Defendants Nunez and Hansler issued legal process to place Mr. Medina under arrest.

194.    Defendants Nunez and Hansler charged Mr. Medina to cover up their wrongful assault of Mr. Medina and their other illegal actions.

195.    Defendants Mukhtarzada, Gomez, and Callan each furthered Defendants Nunez's and Hansler's cover up of their illegal actions and wrongful assault of Mr. Medina.

196.    As a result of Defendants' actions, Plaintiff suffered significant humiliation, trauma and emotional pain, and deprivation of his constitutional rights.

45

197.    Plaintiff seeks compensatory and punitive damages from Defendants

Mukhtarzada, Gomez, Nunez, Hansler, and Callan; and injunctive relief from the City.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

198.    Declare that Defendants' acts, practices, policies, customs and/or omissions have

deprived Plaintiff of his rights under the Fourth and Fourteenth Amendments to the United States

Constitution; 42 U.S.C. § 1983; and the laws and Constitution of the State of New York..

199.    Issue permanent injunctions addressing misuse of chokeholds and Tasers by

NYPD officers through training, supervision, investigation, prosecution and discipline;

200.    Award compensatory damages for economic harm, pain and suffering and

emotional and mental distress to Plaintiff against the City and Defendants jointly and severally,

together with interest and costs;

201.    Award punitive damages to Plaintiff in an amount to be determined at trial against

Defendants, whose actions constituted outrageous conduct, were reckless and showed a callous

indifference to and willful disregard of Plaintiff's rights as set forth above;

202.    Order reasonable attorneys' fees and costs to be paid by Defendants pursuant to

28 U.S.C. § 2414 and 42 U.S.C. § 1988; and

203.    Grant such other and further relief as the Court deems just and equitable.

Dated: New York, New York
          October 10, 2019

Respectfully submitted,

**THE LEGAL AID SOCIETY**

By: *_/s/Cynthia H. Conti-Cook*

Janet Sabel

Of Counsel:
Cynthia H. Conti-Cook
Barbara Hamilton
199 Water Street, 6th Fl.
New York, NY 10038
Tel: (212) 577-3265
cconti-cook@legal-aid.org
bphamilton@legal-aid.org


**COVINGTON & BURLING LLP**

By: *_/s/ David L. Kornblau*

David L. Kornblau
Ishita Kala
The New York Times Building
620 Eighth Avenue
New York, NY 10018
DKornblau@cov.com
IKala@cov.com

*Attorneys for Plaintiffs*